UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DURELL T. CRAIN,

Plaintiff,

v.                                    CAUSE NO. 3:25-CV-827-PPS-APR

LLOYD ARNOLD, et al.,

Defendants.

OPINION AND ORDER

Durell T. Crain, a prisoner without a lawyer, filed a lengthy and often confusing

amended complaint naming nineteen separate defendants. ECF 19. He titles it an

"Amended Emergency Prisoner Complaint." *Id.* "A document filed *pro se* is to be

liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to

less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*,

551 U.S. 89, 94 (2007) (quotation marks and citations omitted). Nevertheless, under 28

U.S.C. § 1915A, I must review the merits of a prisoner complaint and dismiss it if the

action is frivolous or malicious, fails to state a claim upon which relief may be granted,

or seeks monetary relief against a defendant who is immune from such relief.

***Crain's Allegations Against Dr. Liaw, Dr. Jackson, Nurse Ellis, Nurse Hickman,
Nurse Bryan, and Nurse Jacobs***

Crain alleges that, in December 2024 or January 2025, he was being housed in a

location where more inmates smoke paper sprayed with synthetic drugs than in other

locations within the Westville Control Unit ("WCU"). Crain suffers from asthma, and

the smoke bothers him. Dr. Liaw ordered that Crain receive breathing treatments, but

unidentified medical staff refused to give him those treatments. Crain contends that there is a plot to murder him by taking advantage of his sensitivity to smoke and deliberately smoking or setting fire to things near him. That, however, is not the subject of this lawsuit. Crain is litigating the matter of his safety from attacks by other inmates in another case, *Crain v. Cornett*, 3:25-CV-95-PPS-JEM (filed Jan. 29, 2025).

In February 2025, Crain was moved to an area where there was little to no smoking by inmates. Several months later, he claims that unidentified prison staff started inserting rat poison, bug spray, dirt, and smoke into his cell though a vent outside his cell.[1] He reported this, and he was then moved to a different area in May 2025. Crain contends that there is more smoke in the new dorm.[2]

In July 2025, Nurse Ellis told Crain that Dr. Liaw and Dr. Jackson had discontinued his breathing treatments. He was told by someone (he doesn't say who) that one of the reasons his breathing treatments were discontinued is that his oxygen level tests were normal. Crain indicates that he heard Nurse Ellis say that his oxygen level was normal, but Crain indicates this was said "before she gave all my oxygen level test[.]" ECF 19 at 6. Dr. Jackson told Crain that all the nurses said that his oxygen levels were tested before his breathing treatments and the levels were normal. Crain asserts

---

[1] Crain also speculates that this was done in retaliation for filing his lawsuit alleging that inmates were trying to kill him, 3:25-CV-95-PPS-JEM, and because these unknown individuals know about the alleged plot to murder him with smoke. These allegations, however, are not linked to any defendant named in this case.

[2] He asserts that he was transferred in retaliation for reporting the unknown officers that were allegedly inserting things through his vent from outside, but he does not link this allegation to any defendant named in this case.

that Nurse Ellis, Nurse Hickman, Nurse Bryan, and Nurse Jacobs never gave him an oxygen level test before giving him a breathing treatment.[3] He complains that he was given only two oxygen level tests while he was on breathing treatments, they were given by other nurses, and they were both normal. He also explains that he has breathing problems while he is in his cell where there is smoke, and once he is removed from the smoke and walks to the nurse's office, his breathing improves. He told Dr. Liaw that the nurses did not take his oxygen level tests. Nonetheless, Crain contends that the breathing treatments helped him breath better in his cell for longer than when he did not get them. Crain's complaint is not entirely clear, but he seems to be asserting that the nurses were deliberately indifferent to his medical needs by failing to take his blood oxygen levels or wrongly reporting that they had been taken when they had not been taken, and that the doctors were deliberately indifferent to his medical needs because they discontinued Crain's breathing treatments.

Under the Eighth Amendment, inmates are entitled to constitutionally adequate medical care. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish liability, a prisoner must satisfy both an objective and subjective component by showing: (1) his medical need was objectively serious; and (2) the defendant acted with deliberate indifference to that medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A medical need is "serious" if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's

---

[3] Crain alleges that these nurses "fraternize with C.O.'s or inmate's [sic] about the murder-for hire plot on my life." ECF 19 at 6. He does not further explain this statement or how the nurses' discussion of Crain's belief that there is a plot to murder him violated any provision of the Constitution.

attention. *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005). Deliberate indifference means that the defendant "acted in an intentional or criminally reckless manner, i.e., the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005). For a medical professional to be held liable for deliberate indifference to an inmate's medical needs, he or she must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). Inmates are "not entitled to demand specific care," *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019), nor are they entitled to "the best care possible." *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). Negligence does not state a claim. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (holding negligence or medical malpractice do not constitute deliberate indifference).

Nurse Ellis, Nurse Hickman, Nurse Bryan, and Nurse Jacobs allegedly failed to measure Crain's blood oxygen levels and falsely reported to Dr. Jackson and Dr. Liaw that Crain's blood oxygen levels were normal. Crain contends that this led to the decision to discontinue his breathing treatments. But Crain doesn't explain how additional measurements of his blood oxygen levels would have altered the decision to discontinue his breathing treatments. He concedes that the two blood oxygen level tests that were given to him were normal, and that this is because his breathing would improve once he left his cell and was no longer around the smoke and other substances

that he believes are present in his cell. If true, it is unclear why the nurses would indicate that Crain's blood oxygen levels were normal when they had not done the tests, but they are not the individuals that decided to discontinue Crain's breathing treatments, and it cannot be plausibly inferred from the amended complaint that either Dr. Jackson or Dr. Liaw would have continued Crain's breathing treatments if additional blood oxygen tests had been done. Neither can it be plausibly inferred that Dr. Jackson or Dr. Liaw substantially departed from accepted professional judgment, practice, or standards when they made the decision to discontinue Crain's breathing treatments.

In September 2025, Crain had a chronic care appointment for his asthma with Dr. Liaw. Crain explained that he had been having difficulty breathing because of the smoke in his living area, and that the Air Duo inhaler was not helping him as much as the breathing treatment did. Dr. Liaw explained that the Air Duo was stronger than the breathing treatments. Crain explained that he had been on the Air Duo when Dr. Liaw placed him on the breathing treatments the prior December or January. Dr. Liaw did not respond. Crain was taken back to his cell. Later Nurse Bryan told Crain that Dr. Liaw had removed him from the Air Duo inhaler because Crain said it was not working, but Dr. Liaw didn't put him back on breathing treatments, even though Crain told him those helped. This left Crain with no treatment whatsoever for breathing difficulties associated with his asthma. Crain contends that he is still housed in an area with high levels of smoke, that he continues to have trouble breathing, and that he "most times [is] feeling as if [he is] going to die due to the heavy smoking / ongoing

substances being thrown through my vent." ECF 19 at 8. Here, giving Crain the benefit of all favorable inferences, as the court must as this stage of the proceedings, I find that Crain has plausibly alleged that Dr. Liaw was deliberately indifferent to his serious medical needs when he discontinued his Air Duo treatment in September 2025 without offering any alternative treatment.

Since June 2025, Crain has submitted several "emergency" health care requests. He has given these health care request forms to Nurse Hickman, Nurse Bryan, Nurse Jacobs, and Nurse Ellis. None have been responded to. He doesn't describe the nature of each of his emergency requests, but at least some were related to his alleged breathing difficulties. But Crain *has* received some medical care for his asthma during this time: as described above, he was seen by medical staff in July and September. Crain's multiple emergency medical requests brings to mind Aesop's fable, "The Boy that Cried Wolf." When everything is labeled as an emergency, real emergencies are difficult to identify. Without more details about the nature of the requests and the dates that Crain was seen by medical providers, I cannot find that these allegations state an Eighth Amendment deliberate indifference claim against Nurse Hickman, Nurse Bryan, Nurse Jacobs, or Nurse Ellis.

### Claims Against Warden Smiley, Captain Rippe and UTM Sonnenburg

In July 2025, a fan was placed next to Crain's cell so that the air was blowing smoke away from his cell. Crain reports that this helped him breath better. He claims other inmates wanted the fan removed. Around August 18, 2025, Crain sent an unanswered classification appeal and an emergency grievance to Warden Smiley. These

documents informed Warden Smiley and Captain Rippe that a sworn declaration had been filed in one of Crain's other cases pending in this court (3:25-CV-95-PPS-JEM, ECF 25-1), and that declaration indicated that Crain had been removed from his current pod because he complained of high levels of smoke and that he had been placed in a limited smoking area. But Crain was then moved back to the pod where he had complained about high levels of smoke.

After Crain sent the classification appeal and emergency grievance, on September 5, 2025, Captain Rippe and UTM Sonnenburg ordered that the fan be removed. Crain claims that an officer told him that this was done in retaliation for filing the emergency grievance. On September 13, 2025, an officer noticed heavy smoke and turned the fan back on. On Sept 15, 2025, it was removed again, at Captain Rippe's or UTM Sonnenburg's instruction.

To state a First Amendment retaliation claim, an inmate must allege: "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Whitfield v. Spiller*, 76 F.4th 698, 707–08 (7th Cir. 2023) (citation omitted). Filing a grievance is protected First Amendment activity, and these events happened shortly after the grievance was filed, which allows an inference of causation at the pleading stage. *See Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. 2005) (right to access the courts a protected activity); *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (suspicious timing). While under ordinary circumstances removing a fan would

not rise to the level of a depravation that could deter future First Amendment activity, here it can be inferred that Captain Rippe and UTM Sonnenburg knew that the fan was there because Crain had difficulty breathing around smoke and understood that removing it would cause Crain distress. Therefore, with some degree of reluctance I will allow Crain to proceed on a First Amendment retaliation claim against Captain Rippe and UTM Sonnenburg for removing the fan from in front of Crain's cell in September 2025.

After Crain filed an emergency grievance that mentioned he had filed another lawsuit, unidentified officers destroyed his property, including his TV, tablet, and earbuds. This makes it impossible for Crain to make phone calls. These unknown officers also allegedly removed pens from Crain's property to try to stop him from writing grievances, motions, and lawsuits. Warden Smiley, UTM Sonnenburg, and Captain Rippe have allegedly ordered officers and caseworkers not to provide Crain with either pens or the earbuds that would make phone calls possible. Crain can purchase one flex pen from commissary,[4] but he indicates that these pens stop working before they run out of ink. Crain claims he needs more pens than he can purchase from commissary to fill out health care requests and for his litigation. While Crain must have access to a pencil or pen, he is not entitled to more access than is needed to give him meaningful access to the courts. *See Gentry v. Duckworth*, 65 F.3d 555, 558 (7th Cir.1995)

---

[4] Crain does not indicate if he can purchase the ear buds necessary to enjoy phone privileges. He also does not indicate if inmates without ear buds have any other way of making phone calls. Later in Crain's amended complaint, he mentions talking to his daughter and calling an emergency number for mental health help, so this does not appear to be an ongoing problem. ECF 19 at 13.

("Part of meaningful access is furnishing basic scribe materials for the preparation of legal papers.... Of course, prisoners are not entitled to limitless supplies of such materials, merely to that amount minimally necessary to give them meaningful access to the courts."). The avalanche of litigation Crain has brought makes it abundantly clear he has had more than adequate access to a pen. This claim is a trifle and must be dismissed.

### *Crain's Claims Against Mrs. Kmiec, Mrs. Schmidt, Dr. Athens, and John/Jane Doe W.C.F. Psychiatrist*

Next, Crain contends that the smoke and other substances that are being placed through his vents are causing him pain in his "organs." ECF 19 at 11. Crain feels that his complaints about emergency medical problem, the heavy smoke in his housing area, and substances being inserted into his vents from the outside are being ignored. This has caused him emotional, mental, and psychological stress. He went on suicide watch two or three times; but he was not suicidal – he was attempting to get away from the substances that he believes are coming through his vents.

He talked to Mrs. Kmiec, a mental health worker, and told her that he is hearing voices in his head. He told her that sometimes it sounds as if they are coming from the vent. These voices allegedly tell him how they are throwing substances through the vent. They say that he is dead and that they are killing him slowly. They say they have something called "voodoo hoodoo" and he was cursed. ECF 19 at 12. The voices say that they are putting smoke in his body to give him cancer. He told Mrs. Kmiec that he bangs his head on the wall and door to try to make the voices stop. He loses sleep because of these voices. Crain also claims the voices have somehow stopped him from

defecating. Crain has asked Mrs. Kmiec to have him examined by a psychiatrist. He has

allegedly been making that request for six months, but he has not yet been permitted to

see a psychiatrist. Crain feels that Mrs. Kmiec has essentially ignored his mental health

complaints.

On October 9, 2025, Crain dialed #80, a number that inmates can use for

emergency situations. He talked with a mental health worker named Mrs. Schmidt.

Crain explained his circumstances and the voices he is hearing. About a week later, he

submitted a health care request to Mr. Vee, another mental health worker who is not a

defendant in this case. Mr. Vee gave the request to his supervisor, Dr. Athens. Crain

confirmed with Dr. Athens that the request was on her desk. Crain explained what was

happening to Dr. Athens, but from the look on her face, she didn't believe him. Crain

indicates that Dr. Athens is the person who decides whether Crain will get to see a

psychiatrist.

To the extent Crain is alleging that Mrs. Kmiec, Mrs. Schmidt, or Dr. Athens have

been deliberately indifferent to his mental health needs, he has not alleged facts from

which it could be plausibly inferred that any of these individuals' decisions regarding

his treatment were not based on their professional judgment. Therefore, he may not

proceed against Mrs. Kmiec, Mrs. Schmidt, or Dr. Athens. He also may not proceed

against John/Jane Doe Psychiatrist because the amended complaint does not plausibly

allege facts from which it could be inferred that the psychiatrist acted with deliberate

indifference to Crain's serious mental health needs. It does, however, appear that Crain

has serious psychological needs, and it is unclear to me that they are being adequately

10

addressed. Therefore, I will permit Crain to proceed against Warden Smiley in his official capacity only for Crain to receive mental health treatment that is consistent with what the Eighth Amendment requires.

### *Crain's Allegations Against Nurse Berbaker*

In his amended complaint, Crain has added Nurse Berbaker as a defendant. He has several complaints about Nurse Berbaker. Crain has heard her "fraternize" with inmates and staff about the alleged plot to murder him, but he doesn't tell me how these discussions violate the Constitution. He heard her say to Nurse Bryan that "we got to get rid of him." ECF 19 at 14. He also claims that she faked oxygen level tests to get him removed from breathing treatments. She is in charge of reviewing health care requests, and she returned a stack of health care requests about the alleged pain in Crain's organs to him. She allegedly lied on one health care request form by stating that he was seen by a nurse and didn't have any complaints. Crain says he has never seen a doctor or nurse about the pains in his organs. Because Crain alleges that Nurse Berbaker is in charge of reviewing health care request forms that were ignored, Crain may proceed against her on a claim for deliberate indifference to his medical needs. I will also allow Crain to proceed against Warden Smiley in his official capacity only for injunctive relief to receive medical assessment and treatment that is consistent with the requirements of the Eighth Amendment for the pain Crain associates with his organs.

### *Crain's Allegations Against C.O. Warren*

Crain's next allegations are difficult to follow. In June 2025, when Crain moved cell houses, C.O. Warren was one of the officers that moved him. At some point in time,

and the timing is not clear from the complaint, C.O. Warren unplugged Crain's television "from the outside of [his] cell" and removed it. ECF 19 at 14. He also alleges that, during the time when the fan was outside of his cell, C.O. Warren turned it off several times when smoke levels were high. This caused Crain to have difficulty breathing, pain, dizziness, and headaches. His asthma was aggravated throughout the night. Crain told C.O. Warren, but he did not turn the fan back on.

Crain says he never plugged his television in when he moved to his current cell. After the incident where C.O. Warren turned the fan off, he asked Crain why his television was not plugged in. He explained that he had been working on legal work. The next day, Crain asked a correctional officer to plug his television in, but when attempting to screw the cable in, the "whole cable plug" fell off the television. *Id.* at 15. He submitted a tort claim regarding the television, which is pending. He filed a grievance about C.O. Warren turning off the fan. A couple weeks later, C.O. Warren took him to the shower and, out of nowhere, said "You're not watching the game." *Id.* Crain told him his television was not working. C.O. Warren smirked and said, "Sucks to be you, I guess you can write more lawsuits & grievances." *Id.* Crain has been without a television since his move to his current housing unit.

If Crain is claiming that C.O. Warren damaged his television, he does not have a federal claim.[5] He appears to understand this, as he indicates he has filed a tort claim

---

[5] The Fourteenth Amendment provides that state officials shall not "deprive any person of life, liberty, or property, without due process of law . . .." But, a state tort claims act that provides a method by which a person can seek reimbursement for the negligent loss or intentional deprivation of property meets the requirements of the due process clause by providing due process of law. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984) ("For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation

notice pursuant to the Indiana Tort Claim Act. If he is accusing C.O. Warren of retaliating against him, he has not pled facts from which it can be plausibly inferred that C.O. Warren retaliated against him for engaging in protected First Amendment activity. C.O. Warren's snide comment is not, standing alone, actionable.

### *Claims Regarding Crain's Classification*

Crain sent classification appeals to the IDOC Central Office on September 18, 2024, and October 16, 2024. In these appeals, Crain asserted that he had been transferred to a unit where an individual who allegedly helped orchestrate a plot to murder him is also being held. Executive Director of Classification Dalton Haney allegedly knew that Crain was on department wide disciplinary restrictive housing status, but he left him there, where he was ultimately "smoked out," "caught high blood pressure," and is enduring mental, emotional, and psychological distress. ECF 19 at 16.

On May 19, 2025, he sent another classification appeal to the central office. He asked to be placed in a different restrictive housing unit due to what he alleges is a high level of smoke. Gabrielle Adney responded on July 2, 2025. She said that transfer requests are addressed at the facility level before they go to the central office, and he should address his request to the facility. Crain claims this does not accurately reflect the IDOC's policy.[6]

---

remedy.") Indiana's tort claims act (Indiana Code § 34-13-3-1 *et seq*.) and other laws provide for state judicial review of property losses caused by government employees and provide an adequate post deprivation remedy to redress state officials' accidental or intentional deprivation of a person's property. *See Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) ("Wynn has an adequate post-deprivation remedy in the Indiana Tort Claims Act, and no more process was due.").

[6] To the extent that Crain is suing Adney for misstating IDOC policy, he cannot proceed. Crain does not have a constitutional right to have IDOC's policies followed. *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir.

Crain also indicates that, per IDOC policy, he may request a transfer after he has been at the facility for one year. On September 9, 2025, he had been at WCF for one year. He submitted emergency classification appeals to Warden Smiley in August 2025, September 2025, and October 2025. He also sent one to IDOC Commissioner Lloyd Arnold in October 2025. He received only one classification appeal back, and it was the one from August 2025. It was signed by WCF Classification Supervisor Erin Williams on November 25, 2025. The appeal was denied because Williams determined that Crain was "appropriately placed." ECF 19 at 17.

Crain is entitled to be housed in a manner that is consistent with the Eighth Amendment, but Crain isn't entitled to any particular classification or prison assignment. *See DeTomaso v. McGinnis*, 970 F.2d 211, 212 (7th Cir. 1992) ("[P]risoners possess neither liberty nor property in their classifications and prison assignments."); *Healy v. Wisconsin*, 65 Fed. Appx. 567, 568 (7th Cir. 2003) ("[I]nmates do not have a protected liberty interest in a particular security classification.") (citing *Sandin*, 515 U.S. at 486).

While Crain describes his various classification appeals, none of which resulted in him being moved, the crux of Crain's dissatisfaction isn't his classification level but his placement in a unit where he feels unsafe. One of the reasons Crain contends he is unsafe is that he believes there is a plot to murder him and that he is housed with one

---

2003) ("However, 42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices.").

or more people involved with that plot. That, however, is a matter that is being litigated in another case pending before me—3:25-CV-95-PPS-JEM.

Crain also wants to be transferred because he believes that unknown individuals are somehow pumping dangerous substances into his cell. Crain alleges that this occurred both in his previous cell and in his current cell. In one of his filings, he alleges that it occurred while he was hearing voices from his vent. Crain offers no details about how officers could locate his cell vent on the outside of the building and accomplish this. Crain may believe this is occurring, and there may be bugs, dust, smoke, and other unpleasant things in his cell from time to time, but his allegations that unknown officers are purposely inserting them into cell falls within the realm of the "fanciful, fantastic, and delusional." *Denton v. Hernandez*, 504 U.S. 25, 33 (1992) (quotation marks and citations omitted).

Because the only conditions Crain complains about are either being litigated in another case or are in the realm of delusional and perhaps linked to his serious mental health needs, he cannot plausibly state a claim here against the various defendants who have been involved in making decisions regarding his classification appeals.

### *Requests for Preliminary Injunctive Relief*

Crain seeks emergency injunctive relief in both his amended complaint and two emergency motions. ECF 19; ECF 4; ECF 6. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "A plaintiff seeking a preliminary injunction must establish that he is likely

15

to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

As to the first prong, "the applicant need not show that it definitely will win the case." *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). However, "a mere possibility of success is not enough." *Id.* at 762. "A strong showing . . . normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.* at 763 (quotation marks omitted).

As to the second prong, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with . . . injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. "Mandatory preliminary injunctions – those requiring an affirmative act by the defendant – are ordinarily cautiously viewed and sparingly issued [because] review of a preliminary injunction is even more searching when the injunction is mandatory rather than prohibitory in nature. *Mays v. Dart*, 974 F.3d 810, 818 (7th Cir. 2020) (quotation marks omitted). Furthermore,

> [t]he PLRA circumscribes the scope of the court's authority to enter an injunction in the corrections context. Where prison conditions are found to violate federal rights, remedial injunctive relief must be narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and use the least intrusive means necessary to correct the violation of the Federal right. This section of the PLRA enforces a point repeatedly made by the Supreme Court in cases challenging prison conditions: Prison officials have broad administrative and discretionary authority over the institutions they manage.

*Westefer v. Neal*, 682 F.3d 679, 683 (7th Cir. 2012) (quotation marks, brackets, and citations omitted). Therefore, injunctive relief – if granted – would be limited to requiring that Crain be provided with constitutionally adequate conditions of confinement and medical care, as required by the Eighth Amendment.

Crain asks the court to order his immediate transfer to another facility. But this case is about his medical care, mental health care, and retaliation. An order that Crain be transferred to another facility is not a narrowly tailored solution to his alleged needs for treatment of his asthma, pain he associates with his organs, or mental health needs. Crain cannot dictate that the alleged violation be solved through a transfer just because that is the manner that most appeals to him.

Crain also asks the return of a fan to his cell, and that he have permission to have the fan until he is transferred. This request is also not narrowly tailored. Crain is entitled to medical care that comports with the Eighth Amendment, but Crain does not indicate that any medical provider has recommended that Crain have access to a fan due to his breathing problems.

Crain seeks an order that Centurion act on all health care requests, past and future, and an order that he be placed back on breathing treatments. Crain is not entitled to have medical requests addressed in any particular time-frame, and he is not entitled to pick the manner in which his medical conditions are treated. Crain is entitled only to adequate medical care as required by the Constitution. It is unclear if Crain is receiving adequate medical care, but to the extent he is not, there may be multiple

methods of providing constitutionally adequate care to Crain. But what he cannot do is dictate *how* it is provided.

Crain's requests for preliminary injunctive relief will be taken under advisement. Warden Smiley will be required to respond to the requests, and Crain will have an opportunity to file a reply. **Crain is CAUTIONED that this takes time. Impatiently filing additional emergency motions will not advance his cause.** At the same time, the court notes that Crain's allegations, if true, are serious, and the court expects Warden Smiley to work diligently to provide the information needed to adjudicate this matter.

### *Crain's Motion Asking the Court to Take Judicial Notice*

In addition to his complaint and the two motions seeking injunctive relief, Crain filed two motions asking the court to take judicial notice of his filings. ECF 13; ECF 20. The first of these motions contains factual allegations not contained in either his amended complaint or his motions seeking preliminary injunctive relief. A court may take judicial notice of adjudicative facts if they are generally known within the territorial jurisdiction of the trial court or capable of accurate and ready determination by resort to resources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201. Crain's assertions in this motion seeking judicial notice are neither. Therefore, judicial notice will be denied.

In his second motion (ECF 20), Crain asks the court to take judicial notice of declarations he has attached to his motion. But those declarations are a part of the record in this case, so it is unclear why he believes it is necessary for the court to take judicial notice of them. The motion also asks me to take judicial notice of the fact that he

filed a motion in another one of his cases that is pending before me. On November 20, 2025, Crain filed an "Emergency Motion to Reopen Preliminary Injunctive Relief Under Federal Rule of Civil Procedure 60(b) with Exhibit's Attached and to Take Judicial Notice." 3:25-CV-95-PPS-JEM (ECF 84). While the fact of its filing is capable of accurate and ready determination, that motion is not pending in this case, and the fact that it was filed is not relevant to the matters pending here. Yes, there is factual overlap between the two cases, but that motion is not before me in this case. Therefore, I decline to take judicial notice of the fact of its filing in this case because it is not necessary or useful to do so. Therefore, this motion will be denied.

Motions are filed with the court when a party seeks a ruling from a judge. They are *not* filed merely to notify the court of something. Furthermore, I'm growing weary of Crain's use of the word "emergency" with nearly all of his filings. Telling the Court he filed something is not an "emergency" – far from it. And this is not the first time that this has been explained to Crain. *See* 3:24-CV-984-HAB-APR (order dated April 24, 2025, and July 22, 2025). It is expected that Crain will cease filing inappropriate motions for notice and emergency motions. ***If he does not, they will be viewed as an abuse of the judicial process and he may be subject to sanctions, including but not limited to a monetary penalty, dismissal of this case, or a ban on filing in this court.*** Crain is advised to take this admonition seriously. If Crain wants to verify his documents have been received, he can write the clerk and request a copy of his docket sheet; no motion is required.

For these reasons, the court:

(1) DENIES Durell T. Crain's "Motion for Court to Take Judicial Notice of Emergency Motion to Order Lloyd Arnold/Centurion Staff to Take CT Scan/Find Accurate Diagnosis & Care for Diagnosis of Organs & Motion for Court to Order Lloyd Arnold & or Warden to Order Centurion Psychologist to Answer Health Care Request & Evaluate Plaintiff & Order Lloyd Arnold & or Warden to Order Centurion Medical Staff to Immediately Act on Emergency Health Care Request Submitted" (ECF 13);

(2) DENIES Durell T. Crain's "Motion for Cout to Take Judicial Notice of the Declaration of Danny Richards in Case # 3:23-CV-00262 (Pg. 1 Attached), Declaration of Rea L. Hones Attached, & Case # 3:25-CV-95-PPS-JEM Emergency Motion to Reopen Preliminary Injunction Relief Under Federal Rule of Civil Procedure 60(b) When Reviewing Injunctive Relief in this Case #" (ECF 20);

(3) GRANTS Durell T. Crain leave to proceed against Dr. Liaw in his individual capacity for compensatory and punitive damages for deliberate indifference to Crain's serious medical needs when he discontinued Crain's order for Air Duo in September 2025 without offering any alternative treatment for Crain's ongoing breathing problems related to his asthma diagnosis, in violation of the Eighth Amendment;

(4) GRANTS Durell T. Crain leave to proceed against Captain Rippe and UTM Sonnenburg in their individual capacities for compensatory and punitive damages for retaliating against Crain for filing an emergency grievance by removing the fan from in front of his cell in September 2025, knowing the fan was placed there to limit Crain's exposure to smoke that he asserts aggravates his asthma, in violation of the First Amendment;

20

(5) GRANTS Durell T. Crain leave to proceed against Nurse Berbaker in her individual capacity for compensatory and punitive damages for deliberate indifference to Crain's serious medical needs when she ignored multiple healthcare requests forms regarding pain that Crain associates with his organs, leaving him without any assessment or treatment of this condition whatsoever, in violation of the Eighth Amendment;

(6) GRANTS Durell T. Crain leave to proceed against Warden Smiley in his official capacity only, for injunctive relief to receive medical or mental health care, to the extent required by the Eighth Amendment, for the following conditions:

   (a) breathing problems associated with asthma;

   (b) pain that Crain associates with his organs; and

   (c) emotional distress and hearing voices;

(7) DISMISSES all other claims;

(8) DISMISSES Commissioner Lloyd Arnold, Dr. Jackson, Nurse Ellis, Nurse Jacobs, Nurse Bryan, Nurse Hickman, Mrs. Kmiec, Mrs. Schmidt, Dr. Athens, C.O. Warren, Erin Williams, Gabrielle Adney, Dalton Haney, and John / Jane Doe W.C.F. Psychiatrist;

(9) DIRECTS the clerk, under 28 U.S.C. § 1915(d), to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) Jason Smiley, Jason Rippe, and U.T.M. Sonnenberg at the Indiana Department of Correction, with a copy of this order and the amended complaint (ECF 19);

(10) DIRECTS the clerk, under 28 U.S.C. § 1915(d), to request Waiver of Service from (and if necessary, the United States Marshals Service to use any lawful means to locate and serve process on) Dr. Liaw and Nurse Berbaker at Centurion Health of Indiana, LLC, with a copy of this order and the amended complaint (ECF 19);

(11) DIRECTS the Clerk to fax or email a copy of the request for waiver of service, this order, the amended complaint (ECF 19), and the motions seeking preliminary injunctive relief (ECF 4; ECF 6) to Warden Smiley;

(12) ORDERS Warden Smiley to respond to the requests for preliminary injunction contained in Crain's amended complaint (ECF 19) and motions (ECF 4; ECF 6) to the extent that they address Crain's need for medical care relating to his asthma and breathing difficulties, the pain that Crain associates with his organs, and the emotional distress, voices, and delusions that Crain describes in his amended complaint, and to file an affidavit or declaration with the court, explaining how Crain's various medical and mental health needs are being addressed in a manner that comports with the Eighth Amendment's requirements by **January 26, 2026**;

(13) GRANTS Durrell T. Crain until **February 16, 2026**, to file a reply to the Warden's response;

(14) ORDERS the Indiana Department of Correction and Centurion Health of Indiana, LLC to provide the full name, date of birth, and last known home address of any defendant who does not waive service if it has such information; and

(15) ORDERS, under 42 U.S.C. § 1997e(g)(2), Warden Jason Smiley, Jason Rippe, U.T.M. Sonnenberg, and Dr. Liaw, and Nurse Berbaker to respond, as provided for in

the Federal Rules of Civil Procedure and N.D. Ind. L.R. 10-1(b), only to the claims for

which the plaintiff has been granted leave to proceed in this screening order.

SO ORDERED.

ENTERED:  January 5, 2026.

 /s/   Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT